(87 South. 681)

### WOODS v. POSTAL TELEGRAPH–CABLE CO. (7 Div. 58.)

(Supreme Court of Alabama. Oct. 14, 1920. Rehearing Denied Jan. 20, 1921.)

1. Landlord and tenant ⪦93—Lease terminable on lessor's "desire" to "improve" means substantial improvement.

Where a lease required the lessee to vacate on four months' notice of the lessor's desire to improve, the word "desire," which ordinarily means to wish for more or less earnestly, must be treated as something more than a mere vagrant or ephemeral wish unaccompanied by any definite intention of execution, and the word "improve," which ordinarily means to make better, meliorate, or mend, must be construed to contemplate some substantial improvement, and the lease cannot be terminated unless the lessor honestly had intended to make substantial improvements as distinguished from mere rearrangements of windows and doors to suit temporary needs or convenience of changing tenants (citing Words and Phrases, Improvement).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Desire.]

2. Landlord and tenant ⪦291(11)—Where lease provided for termination on lessor's desire to improve, lessor has burden of proving bona fide desire.

Where a lease provided that it should be terminable on the lessor's desire to improve the premises and the lessor served notice to quit, she has the burden of establishing a bona fide desire to improve, for, while the contractual provision does not so expressly stipulate, good faith was obviously intended.

3. Landlord and tenant ⪦93—Landlord did not desire to improve premises, giving right to terminate lease, if she merely desired to prepare them for new tenants; "customary."

Where a lease provided for termination on the lessor's desire to improve the property, a

charge that, if the only work which the lessor desired to do was to rearrange the storeroom to meet the wishes of new tenant as is customary, the lessor was not entitled to recover possession from the original tenant, is proper; the word "customary" being plainly used as a synonym for usual.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Customary.]

**4. Landlord and tenant ☞93—Motive of landlord could be considered in determining whether she desired to improve premises within condition for terminating lease.**

Where a landlord sought to oust the original tenant under a provision in a lease providing for termination in case she desired to improve premises, a bona fide desire to improve was essential, so the question of the landlord's motive may be inquired into.

**5. Landlord and tenant ☞291(12)—Evidence that tenant consulted landlord's agent inadmissible on right to terminate lease to make improvements.**

Where lease provided for termination on notice of the landlord's desire to improve, the fact that the tenant's manager on service of the notice consulted the landlord's agent was inadmissible on the question of whether the landlord actually desired to improve.

**6. Landlord and tenant ☞291(12)—Where lease was terminated on notice of landlord's desire to improve, changes made by succeeding tenant material.**

Where a lease provided for termination on the lessor's desire to improve and the agent of the lessor testified that one who went into possession after service of notice of desire to repair did little in the way of improvements, it was proper on cross-examination to ask the agent what was done.

**7. Landlord and tenant ☞291(12)—Under right to terminate lease to improve, question of salvage on change in premises by tenant admissible.**

Where lessor attempted to terminate lease by service of notice of desire to improve and at the same time executed a lease to another, question to the lessor's agent as to what amount of salvage there would have been to the new lessee if he had gone into the building and put in a front, and afterwards defendant, original lessee, had re-entered for another term and changed it back, was irrelevant and properly excluded.

**8. Appeal and error ☞1033(3)—Erroneous admission of evidence harmless where favorable to plaintiff.**

Where immaterial evidence, in so far as it could have weight or value, was favorable to plaintiff, plaintiff cannot complain of its admission.

**9. Landlord and tenant ☞291(12)—Where lease provided for termination for improvement, custom of changing fronts of buildings on change of tenant admissible.**

Where a lease provided for termination in event the lessor desired to improve, testimony of a local witness that it was customary to change fronts of buildings on change of tenants was admissible to explain the word "improve," as used in the lease.

**10. Appeal and error ☞231(3)—General objection insufficient for exclusion of relevant evidence.**

A mere general objection is insufficient for the exclusion of relevant evidence, though it may have been otherwise objectionable.

**11. Evidence ☞314(1), 582(2)—Testimony that stenographer's transcript of witness' testimony at former hearing was correct inadmissible.**

The stenographer's transcript of witness' testimony at former hearing is mere hearsay, and so testimony by the presiding judge that the transcript was correct is inadmissible, being merely double hearsay, although it is competent for any one who heard the witness' former testimony to state what it was.

**12. Witnesses ☞393(6)—Only portion of former testimony contradicting testimony of witness admissible for impeachment.**

Where a witness had testified on a previous trial, contradictory testimony there given is admissible for impeachment, but only such portion of the testimony previously given as contradicted the present testimony of the witness is admissible.

**13. Appeal and error ☞1005(3)—Denial of new trial cannot be reviewed where the evidence was conflicting.**

Where the evidence conflicted on several vital issues, the appellate court will not review the action of the trial court in denying motion for new trial.

### On Rehearing.

**14. Landlord and tenant ☞93—Where lease provided for termination on lessor's desire to improve, intention by succeeding tenant to improve does not warrant termination.**

Where a lease provided for termination on the lessor's desire to improve the premises and the lessor served notice of termination at the same time leasing to another, the fact that the second tenant intended to improve the premises does not show desire to improve on the part of the lessor and will not justify termination, where the second lessee was not obligated to make any improvements, but they were entirely optional with him.

**15. Trial ☞296(2)—Error in charge which could not have misled harmless in view of other instructions.**

Where a landlord sought to recover possession under an agreement providing for termination of the lease on desire to improve and the court correctly charged that if a second lessee was not obligated to improve there could be no recovery, etc., a charge on that issue, which erroneously used the term "defendant" instead of the name of the second tenant, does not constitute reversible error, where from the context and the other charges the jury could not have been misled; it being a mere slip of the draftsman's pen.

Appeal from Circuit Court, Calhoun County; Hugh D. Merrill, Judge.

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Unlawful detainer by Florence Woods against the Postal Telegraph-Cable Company for a certain storehouse and lot in the city of Anniston. Judgment for defendant, and plaintiff appeals. Affirmed.

The contract of lease was between Miss Woods and the Postal Telegraph-Cable Company for a period of two years with the usual terms and conditions. It contained the following:

The telegraph company agree to vacate premises, on four months' written notice to G. H. Usher, general superintendent, Atlanta, Ga., any time during the first year of this lease provided the lessor sells the building in which these premises are located or desires to improve same, and provided in which case the lessor also pays the telegraph company two hundred dollars damages to cover moving expenses.

The telegraph company agrees to vacate premises any time during second year of this lease, for reasons mentioned in foregoing paragraph and on four months' similar written notice, provided landlord pays one hundred and twenty-five dollars damages to telegraph company to cover moving expenses.

On the 13th day of August, 1917, during the second year of the lease, notice was served on the lessor that the lessee desired to make certain improvements and offering to pay $125 moving expenses. Later they were informed of what changes were sought, and also that the place had been rented to one Bromberg, who filed notice to quit, as did Miss Woods. No question is raised as to notice.

The bulk of the testimony related to a contract made by plaintiff on August 13, 1917, with one F. W. Bromberg, by which she leased this storehouse to him at $125 per month; the term to begin at the end of the four months' period allowed the defendant company for vacation after notice. In the negotiations leading up to that lease plaintiff was represented by J. J. Willett, who testified that the contract with Bromberg was made before notice of cancellation was served on the defendant, and that as a part of the trade Bromberg was to make certain improvements and repairs on the building, that is, was to put in a new plate glass front suitable for a jewelry store, put in a new floor, paper and paint the walls, and adjust the electrical work to suit his own pleasure, in addition to paying $125 per month as rent, which improvements were estimated to cost from $800 to $1,100.

On cross-examination the witness testified, in part, as follows:

"I think plaintiff made about three contracts with Bromberg. One contract was for a lease of the building, and there was an oral contract as to the repairs and improvements he should put on the building, and afterwards Bromberg came into my office and agreed to do the same things. There was only one written contract between us which fixed the amount of rent Bromberg was to pay monthly. * * * He offered $150, but I refused to accept it if it put us on the duty of supervising the repairs and improvements. * * * The real substantial agreement between me and Bromberg was not that I was to let him have the place for $125 per month, and he to do what he pleased about improvements. We had a definite understanding as to what improvements he was to put in."

Witness stated that on the former trial he testified that he showed Bromberg the defendant company's lease and told him, "We can terminate that lease on a four months' notice." He further testified:

That he told Bromberg that he would take $150 as the building stood, and "Bromberg said it would not do for him in the condition it was. * * * I knew very well that we had to improve the building in order to cancel the Postal Telegraph-Cable Company's lease."

After being interrogated as to certain statements made by him on the former trial tending to show that Bromberg's contemplated improvements were permissive merely and not compulsory, the witness answered:

"While I hardly have any definite recollection about that, I relied upon Mr. Bromberg's statement as to what he was going to do, rather than requiring him to do anything. I had confidence in him and did not put it in the nature of a requirement."

Bromberg testified, in part, as follows:

"I offered $150 for the building provided Mr. Willett would fix it. I am bound for nothing more than is set out in this contract. The only difference about that was that I was to put in the window. I told Mr. Willett it would be necessary for the front to be put in; that jewelry stores had to have different fronts and had to be fixed different from other stores. I did not obligate myself to spend any specified amount on this building. I did not agree to put in a floor at all, * * * but I surmised that it needed repairs. There was no contract about the floor, but I would have had to put in a different front and a different glass. * * * The understanding was that I would put it in for my purposes and in my own way for the purposes of conducting a jewelry store. * * * I did not contract to put in the front; I just simply told him I would put in a different front, * * * and what I spent was optional with me, whether it was to be $100 or $500. * * * He gave me the privilege of using the glass already in the building, and for $10 or $20 I could have rearranged the glass there to a jewelry front. * * * I did not obligate myself to use any different glass from what he had there. * * * The only thing I told Mr. Willett was that I would change the front of the store and make it suitable for the jewelry business, and get new material if I saw fit. * * * I had a conversation with Mr. Willett in which he said something about getting the Postal Telegraph-Cable Company down, and he had them out; was going to beat the life out of them, or beat

the devil out of them, or something to that effect."

The cross-examination of the witness Bromberg related chiefly to his testimony on the former trial, and tended to contradict his testimony as above set out.

The testimony of the witness Goodwin, and also of the witness Willett, was to the effect that in most cases store fronts were changed to meet the requirements of new tenants when they went in.

The interpretation and construction placed on the lease contract between plaintiff and defendant is shown by the following instructions given to the jury by the trial judge:

(1) If it was a term of the trade between the plaintiff and Bromberg that it would be left to Bromberg whether the improvements he put on the premises should be of value or should be of substantially no value, then plaintiff cannot recover.

(2) The court charges the jury that if the desire on the part of the plaintiff was merely to get the defendant out and to get Bromberg in at an increased rental, and not a desire in good faith to improve the building, the jury must find for the defendant.

(3) The court charges the jury that, unless the jury are reasonably satisfied from the evidence that the plaintiff had a bona fide desire to improve the building and gave notice to the defendant to terminate the lease in pursuance to such bona fide desire, the jury must find for the defendant.

(4) A mere rearrangement of the front, using the same material and adding only a trifling value to the property, would not be an improvement which would justify the cancellation of the lease.

(5) If, under the agreement between the plaintiff and Bromberg, Bromberg could have discharged his obligations to plaintiff only by expending a trivial sum on alterations, plaintiff cannot recover.

(6) The court charges the jury that in this case the burden of proof is on the plaintiff to reasonably satisfy your mind that she entertained a bona fide desire to improve the property; and, unless this burden has been discharged, your verdict should be for the defendant.

(7) The court charges the jury that if the only work which plaintiff desired to do on the property was to rearrange the storeroom in a minor way in order to meet the wishes of a new tenant, as is customary when one tenant succeeds another, plaintiff cannot recover.

(8) The court charges the jury that if there was no bona fide desire on plaintiff's part to improve the premises, but plaintiff was merely seeking some pretext to bring about the cancellation of the lease, then plaintiff cannot recover.

(9) The court charges the jury that plaintiff would not desire to improve the property, within the meaning of the lease in this case, if she simply rented the property as it stood to Bromberg, leaving him free to improve it or not as he saw fit.

(10) The court charges the jury that if the substance of the transaction between the plaintiff's agent and Bromberg was that Bromberg had rented the property for $125 a month, and was allowed to do work thereon or not, as he saw fit, then plaintiff did not desire to improve the property within the meaning of the clause of the lease which gave plaintiff a right to cancel the same in case of a desire to improve the property.

(11) The court charges the jury that if Bromberg simply told plaintiff's agent that he expected to change the front and do other work on the premises, but that it was not part of the agreement between plaintiff and defendant that Bromberg obligated himself to do so, then plaintiff cannot recover.

(12) The court charges the jury that if the substance of the transaction between plaintiff and Bromberg was that plaintiff rented or undertook to rent the property to Bromberg as it stood, refusing to make any improvements on it herself, and leaving Bromberg to do as he pleased about it, then plaintiff is not entitled to recover.

(13) The court charges the jury that if plaintiff merely feigned a desire to improve the property in order to cancel the lease with defendant, plaintiff cannot recover.

(14) The court charges the jury that if plaintiff had no real desire to improve the property, but merely pretended to have such desire in order to be able to cancel the lease, plaintiff cannot recover.

(15) The court charges the jury that plaintiff could not cancel the lease with defendant by merely alleging that she desired to improve the property; but, in order to entitle her to cancel the lease, she must fairly and honestly have entertained the desire to improve the property. Such desire must have existed as a fact. It must have been actual; not feigned; real, not merely a pretext to cancel the lease of the Postal Telegraph-Cable Company.

(16) The court charges the jury that, in order for plaintiff to recover in this case, she must have entertained a bona fide desire to improve the premises, must have taken or intended taking definite steps to bring about such improvements, and the improvements in contemplation must have been substantial improvements and not mere repairs.

Willett & Walker, of Anniston, and J. J. Mayfield, of Montgomery, for appellant.

The court in the course of the trial misconceived and misconstrued the provision of the contract which determines this case. 40 Cal. 90; 21 Cyc. 1743; 4 Bin. (Pa.) 217; (Pa.) 13 Atl. 527; 14 Wend. (N. Y.) 359; 11 La. Ann. 347; 116 Mich. 228, 74 N. W. 705; 113 Ala. 126, 21 South. 70; 127 Mo. 405, 30 S. W. 115, 48 Am. St. Rep. 640; 2 Taylor's Landlord and Tenant, 119; 16 A. & E. Enc. of Law, 58. Where a party has a right legally to do a particular act, the motive with which he may assert that right is immaterial. 9 N. Y. 444; 28 Vt. 49; 34 Conn. 530; 13 Wend. (N. Y.) 261, 28 Am. Dec. 461. Custom is not permitted to prevail over and nullify the express provisions of a contract, nor to explain an unambiguous one. 155 Ala. 292, 46 South. 780; 76 Ala. 163; 73 Ala. 396, 49 Am. Rep. 54; 104 Ala. 446, 18 South. 38. It

was the duty of the court, and not the jury, to construe this contract. 115 Ala. 396, 22 South. 442; 128 Ala. 221, 29 South. 640. As to the construction, see 104 Ala. 121, 16 South. 148; 28 Ala. 321; 126 Ala. 513, 28 South. 491; 101 Ala. 574, 14 South. 362; 162 Ala. 295, 50 South. 136; 160 U. S. 515, 16 Sup. Ct. 379, 40 L. Ed. 515. The court's especial attention is called to the case of Gunsenhiser v. Binder, 206 Mass. 434, 92 N. E. 705, as a case almost exactly in point.

Knox, Acker, Dixon & Sterne, of Anniston, and W. W. Cook, of New York City, for appellee.

Literal signification must give way to a reasonable construction, when it would lead to an absurd result, or conflict with other provisions of the contract. 13 C. J. 523; 6 Ala. 491; Elliott on Contracts, §§ 1510–1521; 143 Wis. 347, 128 N. W. 43, 32 L. R. A. (N. S.) 383; 15 Wall. 94, 21 L. Ed. 64; 95 U. S. 23, 24 L. Ed. 348; 51 N. J. Law, 1, 16 Atl. 316; 32 N. Y. 405, 88 Am. Dec. 337. As to what constitutes improvements, see 90 Mass. (8 Allen) 212; 245 U. S. 218, 38 Sup. Ct. 112, 62 L. Ed. 252, L. R. A. 1918C, 765, Ann. Cas. 1918E, 660; 4 Ala. App. 607, 58 South. 950. The words "desire to improve" mean a decision or formed design in the mind of appellant, to be followed by execution of that design, and the court properly interpreted the contract and properly instructed the jury. 119 Ala. 55, 24 South. 739, 43 L. R. A. 382; 166 Ala. 307, 51 South. 964; 115 Ala. 153, 21 South. 983.

SOMERVILLE, J. [1] The questions of controlling importance in the trial of the cause in the court below turned upon the interpretation and construction of that provision of the lease contract which authorized the lessor to terminate the lease upon four months' notice to the lessee in case she desired to improve the premises.

As an abstract proposition, to "desire" means ordinarily to wish for more or less earnestly; but, according to context or circumstances, the expression of a desire may import a request or even a demand. One may feel a desire without the remotest intention of seeking its attainment, and, indeed, attainment may be consciously impossible; but the desire may nevertheless be present.

It is, we think, entirely clear that the parties to this contract did not use the word "desire" in that general sense. As stated by this court in Birmingham Water Works Co. v. Windham, 190 Ala. 634, 637, 67 South. 424, 425:

"Contracting parties usually engage upon rational considerations and to reasonable effects and ends; and, when the courts find it necessary to construe instruments of obligation, it is ever proper, and often essential, for them to assume, at least prima facie, that the unreasonable and irrational was not the contractual intent."

So, also, a contract will not be construed so as to render it oppressive or inequitable as to either party, or so as to place one of the parties at the mercy of the other, unless it is clear that such was their intention at the time the agreement was made; and "all words, whether they be in deeds, or statutes, or otherwise, if they be general, and not express and precise, shall be restrained unto the fitness of the matter and person." L. C. Coal Co. v. Ætna Life Ins. Co., 192 Ala. 42, 68 South. 317, Ann. Cas. 1917D, 863. And, when the language of a contract will, with equal reason, bear more than one interpretation, courts are inclined to give to it that meaning which is unfavorable to the party who has used or drafted the language. Denson v. Caddell, 201 Ala. 194, 77 South. 720; 16 R. C. L. 699, § 188.

Manifestly, the provision looking to the cancellation of this lease contemplated something more than a vagrant or ephemeral wish to improve the building. In reason and fairness it must have meant a desire accompanied by a definite intention of execution and attainment—action, in short, which would lead to practical results. And, while the expression of such a desire in the appointed way may be prima facie evidence of its existence, yet it is the actual existence of the desire, and not its expression merely, which must furnish the basis and justification for the cancellation of the lease. Worthington v. Gwin, 119 Ala. 44, 55, 24 South. 739, 43 L. R. A. 382, citing Electric Lighting Co. v. Eider Bros., 115 Ala. 138, 21 South. 983; Jones v. Lanier, 198 Ala. 363, 365, 73 South. 535. Those cases, it is true, deal with the mental state or conclusion of dissatisfaction with goods supplied or labor done; but the principle is in no wise different. In all such cases the desire must exist and the decision must be made in good faith; that is, actually and without dissimulation. Jones v. Lanier, 198 Ala. 363, 365, 73 South. 535; Nicolopole v. Love, 39 App. D. C. 343, 47 L. R. A. (N. S.) 949, and note, citing and reviewing the strongly analogous cases of Russell v. Collins, 8 Vesey, Jr., 34: Donohue v. New York, 54 Misc. Rep. 415, 105 N. Y. Supp. 1069, Hodgkins v. Price, 137 Mass. 13, and Muzzy v. Allen, 25 N. J. Law, 471—all of which relate to the cancellation of a lease upon some action by the lessor.

According to Worcester's Unabridged Dictionary, "to improve," in its general and ordinary use, is simply to make better, to meliorate, to mend. When we speak of improving a building, we generally mean making it better; that is, more valuable or more convenient for use. Speaking of our statute

giving a lien to mechanics and materialmen, this court has said:

"The terms 'building or improvement,' as here used, are not necessarily synonymous, and have a different signification from 'repairs thereto,' although repairs ordinarily may be an improvement. * * * An improvement may be an independent structure or addition, and it may be an addition to or mere betterment of a building or improvement already made. * * * " Wimberly v. Mayberry, 94 Ala. 240, 243, 10 South. 157, 158 (14 L. R. A. 305).

See, also, Bates v. Harte, 124 Ala. 427, 26 South. 898, 82 Am. St. Rep. 186.

In Parker v. Wulstein, 48 N. J. Eq. 94, 21 Atl. 623, it was said that "improvements," as used in a lease which provided that all improvements of the building shall belong to the landlord at the expiration of the term, may be said to "comprehend everything that tends to add to the value or convenience of a building or a place of business, whether it be a store, manufacturing establishment, warehouse, or farming premises. It certainly includes repairs of every description. It necessarily includes much more than the term 'fixtures.' " And to the same effect are French v. Mayor of N. Y., 16 How. Prac. (N. Y.) 220, 222; Ames v. Trenton Brewing Co., 56 N. J. Eq. 309, 38 Atl. 858; and many other authorities. 2 Tayl. Landlord and Tenant (8th Ed.) p. 119; 16 A. & E. Enc. Law (2d Ed.) 58; 4 Words and Phrases, 3454. Of course, the word "improve" has no fixed meaning in law, and its significance and application will be determined in each case by the relation of the parties to be affected, and the object to be accomplished by the statute or contract in which the word is used.

Keeping these factors in mind, we think it is clear that the "improvement" contemplated by the parties to this contract was something substantial in its character, as distinguished from that which is petty or minute; and permanent in its use and value, as distinguished from that which is ephemeral or subject to easy and frequent change.

The case of St. Andrews Church's Appeal, 67 Pa. 512, 519, is strongly in point. The court was there construing a covenant restricting the uses of certain lots of land, and it was said, per Sharswood, J.:

"It may be well to remark at the outset that according to the express terms of the instrument in which the covenant is comprehended, the restrictions were only to cease 'whenever either of the said lots of ground shall be improved by buildings, which shall be built in accordance with the spirit of this agreement.' The spirit of the agreement evidently contemplated the improvement of the ground by the erection of permanent buildings. That is the popular and ordinary sense of the word 'improved.' It does not refer to mere temporary structures, intended only to answer the purposes of present use, however long that use

might continue. We can easily understand the difference, without perhaps being able to draw an exact line. Every case must depend upon its own circumstances."

So, in Bates v. Harte, 124 Ala. 427, 26 South. 898, 82 Am. St. Rep. 186, supra, it was held:

"That a well designed and made for a *permanent* supply of water is an improvement upon land within the meaning of the statute referred to"—Code 1896, § 2723. (Italics supplied.)

It may be that under the circumstances of this case, and under the principles of construction above noted, the improvement intended by the parties should properly be held to be nothing less than such a rehabilitation or reconstruction of the building as would in physical extent require the vacation of the building, and in value be substantially inconsistent with the rent reserved. But the exigencies of the case do not require a ruling upon that proposition.

It is, we think, quite clear that the making of minor improvements not affecting substantially the structure of the building, or its use, or its rental value, were not contemplated by the parties as the contingency which would lead to the extinction of defendant's term, and the expulsion of defendant from the premises. Hence mere rearrangements or readjustments of windows or doors to suit the temporary needs or convenience of changing tenants, to be made at a comparatively insignificant cost, would not be an improvement within the meaning of the contract.

The several instructions given to the jury are in harmony with the views above expressed, and the issues of fact embraced therein were properly submitted to the jury under the evidence before the court.

[2] Charge 6 does not misplace the burden of proof. Plaintiff was bound to show the existence of a bona fide, i. e., a real, actual, desire on her part to improve the building. Although such a contractual provision does not expressly stipulate for good faith, yet good faith is always intended, and is as necessary in the proof as if it were expressed in the contract itself. El. Lighting Co. v. Eider Bros., 115 Ala. 138, 153, 21 South. 983. It is true that good faith may often be presumed from the facts, but that is quite apart from and does not change the primary burden of proof.

[3] Charge 10 was not erroneous by reason of its allusion to the customary practice of rearranging storerooms in a minor way to meet the wishes of new tenants. The evidence showed without dispute that store fronts were usually changed to suit new tenants, especially those going into a new line of business; and the word "customary" was

plainly used as a synonym for "usual," and not in the sense of a fixed custom by which any one was to be bound. Moreover, mere minor rearrangements to meet the wishes of the new tenant Bromberg, and not resting upon a primary and independent desire on the part of plaintiff, would not have met the requirement, whether such changes were customary or not.

[4] Charges A and B, refused to plaintiff, asserted that, with respect to plaintiff's right to improve the building, her motive could not be inquired into.

If one has a legal right to do an act, it is true that a bad motive does not render the act wrongful; and, so far as the rightfulness or wrongfulness of the act is concerned, motive is immaterial and will not be inquired into. But upon the question of the existence of the right as a matter of fact, depending as it did upon the existence of a bona fide desire to improve the building—as to which the testimony and its inferential tendencies were in sharp conflict—the question of motive was material, and was a legitimate subject of inquiry and consideration. As framed, these charges were erroneous and properly refused.

[5] The fact that defendant's local manager went to Willett, after the service of the notice to vacate, to see if they could find a place to move to, was not material to any issue before the jury; nor did it appear that the agent was authorized by defendant to act for it in that regard. For either reason, evidence of that fact was properly excluded.

[6] The witness Willett having testified that the Anniston Optical Company, who went into possession of the building after its vacation by defendant, had done very little in the way of improvements, it was not error to allow defendant on cross-examination to ask him what they did. Nor, in any case, could the answer have been prejudicial to plaintiff.

[7, 8] The question to the witness Willett as to what amount of salvage (?) there would have been to Bromberg if he had gone into the building and put in a front, and afterwards defendant had re-entered for another term and changed it back, was irrelevant and should have been excluded. But so far as the answer could have any weight or value, it was undoubtedly favorable to plaintiff, and its admission cannot support a finding of prejudicial error.

[9, 10] The testimony of the witness Goodwin that in a majority of instances, as a rule, they change the fronts of the houses, in the territory where this building was, when they change the tenants, was not competent for the purpose of changing the terms of any lease contract between plaintiff and Bromberg, and it was manifestly not offered for that purpose. It was, however, competent for the purpose of explaining the meaning and scope of the term "improve" as used in defendant's lease. However, Goodwin's statement was merely cumulative of what had already been stated by Willett, on his cross-examination, and certainly added no prejudicial weight thereto. Moreover, the objection to the testimony was general merely, and therefore insufficient for the exclusion of relevant matter, though it may have been otherwise objectionable. Its use and effect could have been limited by appropriate instruction to the jury.

[11] On the former trial of the case in the inferior court, defendant's witness Bromberg had testified, and his testimony was taken down by a stenographer who made a transcript thereof. Plaintiff asked the presiding judge Leyden if that testimony, as read by him several days later, was in there substantially as Bromberg delivered it on the stand. Objection to this being sustained, plaintiff offered to prove by Judge Leyden that said report was substantially correct, and offered the report in connection with Leyden's testimony. Objection to this was also sustained.

[12] The stenographer's report of Bromberg's testimony was but hearsay, and was not admissible in evidence. The questions to the witness Leyden called for merely an affirmation that the stenographer's statement was correct—a form of double hearsay. It was competent for any witness who heard Bromberg's former testimony to state what it was, but only such portions of it were here admissible as tended to contradict his present testimony. After the adverse rulings referred to, plaintiff was allowed, without objection, to bring out from the witness a number of such contradictory statements, which was all that he was entitled to do, and no prejudice is apparent.

[13] In the state of the evidence, as shown by the bill of exceptions, we cannot reverse the action of the trial judge in overruling plaintiff's motion for a new trial. The evidence is conflicting on several vital issues, and, whatever the real truth may be, its ascertainment was for the jury, and their verdict is sufficiently supported by the evidence.

Finding no prejudicial error in the record, the judgment will be affirmed.

Affirmed.

ANDERSON, C. J., and McCLELLAN and THOMAS, JJ., concur.

On Rehearing.

SOMERVILLE, J. [14] In defining the meaning of the word "desire," as we conceive it to have been used in the lease-contract here involved, we have said:

"In reason and fairness it must have meant a desire accompanied by a definite intention of execution and attainment—action, in short, which would lead to practical results."

We think that counsel has misunderstood the meaning of the latter phrase, which is due perhaps to an ellipsis in its structure. We did not mean to say that any action must be actually taken in order to establish a desire to improve, but only that there must be a definite intention to proceed to action in due course.

Thus understood, there is nothing in our definition of the word, or in our construction of the contract, which is not in harmony with the case of Gunsenhiser v. Binder, 206 Mass. 434, 92 N. E. 705, which is cited by counsel as a "gray horse case" in contradiction of our rulings.

In the Gunsenhiser Case, the lease-contract was, indeed, substantially like the one before us, except that its termination was to be based upon a desire "to sell" instead of "to improve." The court said:

"In order to constitute a desire to sell or convey, within the meaning of the language of the lease, it was not necessary that the plaintiff [lessor] should enter into a binding agreement to convey. Nor was an entry upon the land by the plaintiff necessary."

So, in the instant case, it was clearly not necessary, to the establishment of plaintiff's "desire to improve," that she should enter upon the premises, or make any binding contract to improve them. But if she made a lease of the premises, contemporaneously with the expression of her desire to improve, by the terms of which he disclaimed any obligation or purpose to improve, and, indeed, disabled herself from doing so (as to which the affirmative evidence is without dispute), and left the whole matter of repairs to the judgment and discretion of her intended tenant, Bromberg (as to which the evidence is in dispute), this was an unequivocal negation of the existence of any intention on her part to improve, and nullified the prima facie probative value of her declaration made to defendant. There is serious error in the assumption that Bromberg's independent desire to improve for his own convenience could supply the want of any desire or intention to improve on the part of plaintiff. Nor would plaintiff's desire to have Bromberg make some improvements for himself, merely in order to supply the required ground for terminating the lease, measure up to the requirements of the stipulation.

If, on the contrary, Bromberg was obligated by plaintiff to make substantial improvements her action was in harmony with, and not in contradiction of, her previously expressed desire and purpose.

Charges 10 and 11 properly presented this view of the law to the jury in relation to the evidence before the court.

Obviously enough plaintiff's desire to improve was not, as an abstract proposition, limited to improvements to be made through the agency of Bromberg, or of any prospective tenant. But, under the circumstances shown, having expressly disclaimed any desire or purpose to improve by her own action, or for her own purposes, and having leased the premises to Bromberg with no apparent reservation of the right to enter and make improvements—her own desire to improve, if any she had, could be exhibited and established only by her imposition of a compulsory duty upon Bromberg to make for her the improvements she actually desired and actually intended to make.

[15] Charge 11 given at the instance of defendant and already referred to in connection with charge 10, is in the following language:

"The court charges the jury that if Bromberg simply told plaintiff's agent that he expected to change the front and do other work on the premises, but it was no part of the agreement between plaintiff and defendant that Bromberg obligated himself to do so, then plaintiff cannot recover."

The use of the word "defendant" in this charge in lieu of "Bromberg" is obviously a mere slip of the draftsman's pen—an error which, in view of the context, and of the whole tenor of the other instructions. general and special, must be regarded as self-correcting and incapable of being misunderstood by the jury. As stated by counsel in brief, in urging this verbal error as a ground for condemning the charge and working a reversal of the judgment, "there was not even a claim or a contention that any agreement or contract between plaintiff and defendant obligated or attempted to obligate Bromberg to improve the premises." In short, the use of any other word than "Bromberg" in that connection was without sense or meaning. A conclusive argument that the error was in fact corrected, and the right word sufficiently indicated, by the context itself, may be found in the fact that the astute and experienced counsel who represented the plaintiff at the trial and on appeal never observed the inaccuracy complained of until the affirmance of the judgment by this court—a statement which we venture to make in view of the fact that it is now for the first time brought to our attention on this application for a rehearing. This view of the matter is perhaps strengthened by the further consideration that we ourselves failed to notice the defect in spite of repeated inspection and consideration of the language of the charge.

Similar slips of speech in instructions to juries have often been held harmless where

the true sense was manifest, even though the substituted word, standing alone, would mean exactly the opposite of the word intended. South. Bell Tel. Co. v. Jordan, 87 Ga. 69, 13 S. E. 202; Anderson v. Anderson, 128 Ind. 254, 27 N. E. 724; In re Spencer. 96 Cal. 448, 31 Pac. 453; Citizens', etc., Co. v. O'Brien, 118 Ill. 174, 8 N. E. 310; O'Connor v. Langdon, 3 Idaho, 61, 26 Pac. 659; Shipley v. Reasoner, 87 Iowa, 555, 54 N. W. 470; and many other cases.

A review of the record, and a thorough consideration of the arguments of counsel, have not led us to doubt the correctness of our original conclusions, and the application for rehearing will therefore be denied.